IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

**FILED**

Dec 05, 2016

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

WILLIAM ROBERT MCCONNELL,

     Petitioner,

  vs.

SHAWN HATTON, Acting Warden,
Correctional Training Facility,[1]

     Respondent.

No. 2:13-cv-02517-JKS

MEMORANDUM DECISION

   William Robert McConnell, a state prisoner proceeding *pro se*, filed a Petition for a Writ

of Habeas Corpus with this Court pursuant to 28 U.S.C. § 2254.  McConnell is in the custody of

the California Department of Corrections and Rehabilitation and incarcerated at the Correctional

Training Facility in Soledad, California.  Respondent has answered, and McConnell replied.

## I. BACKGROUND/PRIOR PROCEEDINGS

   On October 1, 2009, McConnell was charged with murder with a firearm.  On direct

appeal of his conviction, the California Court of Appeal recounted the following facts underlying

the charges against McConnell:

    In August 2009, [McConnell] lived in a rural portion of Plumas County known as
Dixie Valley.  Several miles of unpaved road separated his house from the nearest town.
A sheepherder named Eduardo Campos–Perez also lived in Dixie Valley.  He was a
Mexican immigrant who spoke very little English.  Campos–Perez used an ATV and
several dogs to herd the sheep.  He lived in a trailer about a mile from [McConnell's]
house.
    On the evening of August 6, 2009, Campos–Perez arrived at [McConnell's] house
unannounced.  [McConnell] had consumed several beers during the course of the day and
was watching a movie when the unexpected visitor arrived on his ATV.  While the men
did not share a common language, Campos–Perez managed to convey to [McConnell]

---

[1]  Shawn Hatton, Acting Warden, Correctional Training Facility, is substituted for
the Warden of California State Prison, Solano.  FED. R. CIV. P. 25(c).

that his ATV was having mechanical problems. He also offered [McConnell] some vodka. [McConnell] invited Campos–Perez onto his porch and retrieved two glasses from the house. After taking a couple shots of vodka, [McConnell] examined the ATV, discovered the gear shifter had come loose, and determined he did not have the proper tools to fix the vehicle.

[McConnell] and Campos–Perez returned to the porch to drink some more vodka. Their conversation began amicably enough, although they struggled to understand each other. Several drinks later, the men began to fight. According to [McConnell's] account of events, he told Campos–Perez to keep his dogs away from [McConnell's] house because the previous year one of these dogs impregnated [McConnell's] Rottweiler. Without warning, Campos–Perez hit [McConnell] in the face, knocking him to the floor. He then hit [McConnell] two or three more times. When [McConnell's] Rottweiler stepped in to protect [McConnell], Campos–Perez started yelling in Spanish and kicked the dog. [McConnell] grabbed Campos–Perez, pushed him off of the porch, and then helped the man to his feet, explaining that he "felt bad" and did not understand why Campos–Perez suddenly became upset. Campos–Perez continued yelling in Spanish and resumed kicking the dog.

[McConnell] ran into the house and retrieved a .45 caliber semi-automatic handgun for protection. According to [McConnell], while he was in the house, Campos–Perez tried to steal his truck. [McConnell] ran outside with the handgun and "must have" fired two rounds at the vehicle, which ended up stuck in a ditch across the road from the house. One of the rounds struck and flattened the left rear tire. The other round struck the left side of the truck bed, penetrated into the bed, and lodged in the spare tire.

[McConnell] ran back into the house and exchanged the .45 caliber handgun for a Marlin 30–30 lever action rifle. According to [McConnell], as he approached the truck with the rifle, Campos–Perez emerged from the driver's side of the vehicle and "came at [him]." [McConnell] pulled the trigger, but the rifle did not fire. [McConnell] "about had a heart attack," quickly chambered another round, and shot Campos–Perez in the chest. Campos–Perez immediately collapsed to the ground. [McConnell] , "totally in shock at this point," stood motionless for a couple minutes. Convinced that Campos–Perez was dead, defendant opened the driver's side door and turned off the vehicle. He then tried to call 911, but neither of his cell phones worked.

The next morning, [McConnell] walked to a neighbor's house, borrowed an ATV, and drove to Martin Meyer's house about a mile away. Meyer was one of [McConnell's] close friends. He was also the man who sold [McConnell] the .45 caliber handgun [McConnell] used to shoot the truck the night before. When [McConnell] arrived, he told Meyer that "he got in a fight, an argument, with the sheepherder and that he had killed him." [McConnell] asked Meyer to call his mother and the co-owner of [McConnell's] house. [McConnell] also told Meyer to come over to his house to pick up the handgun if he wanted it back since [McConnell] would probably be going to jail and the gun would be confiscated. After retrieving the gun and a phone card from [McConnell's] house, Meyer drove to the town of Chilcoot, called the Sheriff's Department, and made the other requested phone calls.

2

Deputy John Fatheree and Detective Michael Smith arrived a short time later and followed Meyer back to [McConnell's] house. When they arrived, [McConnell's] truck was still in the ditch and Campos–Perez's body was still lying on the ground near the truck. [McConnell] was standing on the porch with his hands in the air. The Marlin 30–30 rifle [McConnell] used to kill Campos–Perez was lying on a table on the porch along with a .22/.410 rifle/shotgun combo and two air rifles.

Detective Smith questioned [McConnell] on the porch. Later in the afternoon, Sergeant Steven Peay arrived and also questioned [McConnell]. [McConnell's] account of events was essentially that described above, except that [McConnell] omitted all mention of the .45 caliber handgun. [McConnell] was arrested later in the evening, transported to the Plumas County Jail, and questioned again at the Sheriff's Department shortly after midnight. During this interview, [McConnell] acknowledged the role the .45 caliber handgun played in the events of the previous night, but maintained that Campos–Perez attacked him on the porch, attempted to steal his truck, and ran toward him immediately before the fatal shot was fired.

Certain aspects of [McConnell's] account are not supported by the physical evidence. For instance, while [McConnell] claimed Campos–Perez attacked him on the porch and hit him several times, neither Detective Smith nor Deputy Fatheree witnessed any injuries on [McConnell] consistent with such an assault. While [McConnell] claimed his dog stepped in to defend him, prompting Campos–Perez to kick the animal several times, the dog did not appear to be injured. Nor were there any bite marks on Campos–Perez's body. And while [McConnell] claimed Campos–Perez ran toward him prior to being shot, the position of his body and the footprints at the crime scene indicated that Campos–Perez was running, not toward [McConnell], but in a perpendicular direction away from the truck when the fatal shot was fired. Moreover, the bullet entered Campos–Perez's upper left arm, severed the humerus, exited the arm through the armpit, and then entered the chest cavity, penetrated the heart, both lungs and liver, passed through a rib, and lodged in the soft tissue on the right side of his body. This path is inconsistent with [McConnell's] claim that Campos–Perez ran toward him and that [McConnell] fired at the center of his chest.

*People v. McConnell*, No. C066061, 2012 WL 267899, at *1-3 (Cal. Ct. Appt. 2012).

On June 14, 2010, McConnell proceeded to a jury trial. After trial, the jury found McConnell guilty of second-degree murder with personal use of a handgun. The trial court subsequently denied probation and sentenced McConnell to 40 years to life imprisonment (15 years to life for second-degree murder plus 25 years to life for the gun use enhancement).

Through counsel, McConnell appealed his conviction, arguing that: 1) the firearm enhancement should be reversed because the verdict form listed "personal use of a firearm" and

not "personal discharge of a firearm"; 2) McConnell's statements to law enforcement should have been suppressed because they were unlawfully obtained; 3) the trial court erroneously refused to give requested jury instructions defining provocation to include assault, trespass, and theft of property; 4) the prosecutor committed misconduct by reading in summation to the jury a California Supreme Court opinion; and 5) the trial court erred by allowing the jury to receive transcripts of McConnell's recorded police interviews rather than playing the recordings themselves. The Court of Appeal unanimously modified McConnell's sentence with respect to the firearm enhancement but otherwise affirmed the judgment in a reasoned, unpublished opinion issued on January 27, 2012. *McConnell*, 2012 WL 267899, at *16. The record does not indicate whether McConnell petitioned for review in the California Supreme Court.

McConnell, proceeding *pro se*, then filed a petition for a writ of habeas corpus in the Court of Appeal. In that petition, he argued that counsel was ineffective for failing to adequately investigate a self defense and for failing to prepare and call McConnell to testify on his own behalf. McConnell further contended that he was actually innocent because he "acted in the reasonable belief that he was again being assaulted and feared for his safety." The Court of Appeal summarily denied the petition on June 6, 2013.

McConnell timely filed a *pro se* Petition for a Writ of Habeas Corpus to this Court on November 25, 2013. Respondent moved to dismiss the Petition because it contained an unexhausted claim that had not been presented to the state supreme court (Ground 5). Through a previously assigned judge, this Court dismissed McConnell's unexhausted claim 5 without prejudice and directed Respondent to answer the remaining claims. Respondent filed its answer on October 14, 2014. Docket No. 29. McConnell then moved to correct and augment the

4

record.  Docket No. 37.  In response to McConnell's motion, a previously-assigned magistrate judge ordered Respondent to contact the superior court to obtain copies of McConnell's state habeas petitions and any decisions.  Docket No. 42.  Respondent filed with the Court McConnell's habeas petition in county court as well as the order denying it.  Docket No. 43.  Those petitions raised McConnell's ineffective assistance and actual innocence claims.  Respondent also filed an amended answer addressing the claims raised in those petitions.  Docket No. 45.  This Petition is now fully briefed and before the undersigned judge for adjudication.

## II. GROUNDS/CLAIMS

In his *pro se* Petition before this Court, McConnell raises the following grounds for relief: 1) trial counsel was ineffective for failing to adequately investigate a self defense; 2) trial counsel was ineffective for failing to advise, prepare, and call McConnell to testify; 3) he is actually innocent of the crime of which he was convicted; 4) he was denied due process by the trial court's failure to exclude statements he made to law enforcement; 6) the trial court erred in refusing to instruct the jury that provocation includes assault, trespass, and theft of property; and 7) the prosecutor committed misconduct by quoting from a California Supreme Court case during summation.[2]  In his Traverse, McConnell additionally requests an evidentiary hearing.

## III.  STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the

---

[2]        As aforementioned, Ground 5 was previously dismissed as unexhausted.

Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2). A state-court decision is contrary to federal law if the state court applies a rule that contradicts controlling Supreme Court authority or "if the state court confronts a set of facts that are materially indistinguishable from a decision" of the Supreme Court, but nevertheless arrives at a different result. *Williams v. Taylor*, 529 U.S. 362, 406 (2000).

The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the relevant state-court decision." *Id.* at 412. The holding must also be intended to be binding upon the states; that is, the decision must be based upon constitutional grounds, not on the supervisory power of the Supreme Court over federal courts. *Early v. Packer*, 537 U.S. 3, 10 (2002). Where holdings of the Supreme Court regarding the issue presented on habeas review are lacking, "it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'" *Carey v. Musladin*, 549 U.S. 70, 77 (2006) (citation omitted).

To the extent that the Petition raises issues of the proper application of state law, they are beyond the purview of this Court in a federal habeas proceeding. *See Swarthout v. Cooke*, 131 S. Ct. 859, 863 (2011) (per curiam) (holding that it is of no federal concern whether state law was correctly applied). It is a fundamental precept of dual federalism that the states possess primary authority for defining and enforcing the criminal law. *See, e.g.*, *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (a federal habeas court cannot reexamine a state court's interpretation and application of state law); *Walton v. Arizona,* 497 U.S. 639, 653 (1990) (presuming that the state

court knew and correctly applied state law), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002).

In applying these standards on habeas review, this Court reviews the "last reasoned decision" by the state court. *See Robinson v. Ignacio,* 360 F.3d 1044, 1055 (9th Cir. 2004) (citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)). Under the AEDPA, the state court's findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

## IV. DISCUSSION

A.   *Ineffective Assistance of Counsel* (Grounds 1, 2)

McConnell first argues that he was denied the effective assistance of counsel because counsel failed to conduct a reasonable investigation to show that the victim attacked him and failed to advise, prepare, and call him to testify on his own behalf. To demonstrate ineffective assistance of counsel under *Strickland v. Washington*, a defendant must show both that his counsel's performance was deficient and that the deficient performance prejudiced his defense. 466 U.S. 668, 687 (1984). A deficient performance is one in which "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Id.*

The Supreme Court has explained that, if there is a reasonable probability that the outcome might have been different as a result of a legal error, the defendant has established prejudice and is entitled to relief. *Lafler v. Cooper*, 132 S. Ct. 1376, 1385-86 (2012); *Glover v. United States*, 531 U.S. 198, 203-04 (2001); *Williams*, 529 U.S. at 393-95. Where a habeas petition governed by AEDPA alleges ineffective assistance of counsel, the *Strickland* prejudice

standard is applied and federal courts do not engage in a separate analysis applying the *Brecht*

harmlessness standard.  *Avila v. Galaza*, 297 F.3d 911, 918, n.7 (9th Cir. 2002); *see also Musalin*

*v. Lamarque*, 555 F.3d 830, 834 (9th Cir. 2009).  Under this rubric, in reviewing ineffective

assistance of counsel claims in a federal habeas proceeding:

> The question "is not whether a federal court believes the state court's
> determination" under the *Strickland* standard "was incorrect but whether that
> determination was unreasonable—a substantially higher threshold."  And, because the
> *Strickland* standard is a general standard, a state court has even more latitude to
> reasonably determine that a defendant has not satisfied that standard.

*Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (citations omitted); *see also Runningeagle v.*

*Ryan*, 686 F.3d 758, 775 (9th Cir. 2012).

Thus, McConnell must show that defense counsel's representation was not within the

range of competence demanded of attorneys in criminal cases, and there is a reasonable

probability that, but for counsel's ineffectiveness, the result would have been different.  *See Hill*

*v. Lockhart,* 474 U.S. 52, 57 (1985).  An ineffective assistance of counsel claim should be denied

if the petitioner fails to make a sufficient showing under either of the *Strickland* prongs.  *See*

*Strickland*, 466 U.S. at 697 (courts may consider either prong of the test first and need not

address both prongs if the defendant fails on one).

    1.    *Failure to investigate*

As he did in his habeas petitions to the state courts, McConnell offers only conclusory

assertions, unsupported by any competent evidence such as a declaration from trial counsel, in

support of his claim that trial counsel failed to adequately investigate a defense that the victim

attacked McConnell.  Likewise, McConnell does not name any witnesses he believes should

have been called or point to any specific evidence that he feels was overlooked.  The record

likewise does not indicate that trial counsel's investigation was inadequate in any way.  Because McConnell has failed to meet his burden of proof on habeas, he is not entitled to relief, and his ineffective assistance of counsel claim is rejected on that basis.  *See Bragg v. Galaza*, 242 F.3d 1082, 1088 (9th Cir. 2001) (finding that mere speculation that witness might have given helpful information if interviewed insufficient to establish ineffective assistance of counsel); *Dows v. Wood*, 211 F.3d 480, 486 (9th Cir. 2000) (rejecting ineffective-assistance-of-counsel claim based on counsel's failure to interview or call alibi witness because petitioner provided "no evidence that this witness would have provided helpful testimony for the defense"); *see also Turner v. Calderon*, 281 F.3d 851, 881 (9th Cir. 2002) ("self-serving statement" insufficient to raise claim for relief).

In any event, the claim is without merit.  As the Ninth Circuit has explained, "ineffective assistance claims based on a duty to investigate must be considered in light of the strength of the government's case."  *Eggleston v. United States*, 798 F.2d 374, 376 (9th Cir. 1986).  "When, . . . the prosecution has an overwhelming case based on documents and the testimony of disinterested witnesses, there is not too much the best defense attorney can do."  *Id.* (quoting *United States v. Decoster*, 624 F.2d 209, 210 (D.C. Cir. 1976)).  Here, as the Court of Appeal explained, the physical evidence was strong, and heavily contradicted McConnell's account of events:

> For instance, while [McConnell] claimed Campos–Perez attacked him on the porch and hit him several times, neither Detective Smith nor Deputy Fatheree witnessed any injuries on [McConnell] consistent with such an assault.  While [McConnell] claimed his dog stepped in to defend him, prompting Campos–Perez to kick the animal several times, the dog did not appear to be injured.  Nor were there any bite marks on Campos–Perez's body.  And while [McConnell] claimed Campos–Perez ran toward him prior to being shot, the position of his body and the footprints at the crime scene indicated that Campos–Perez was running, not toward defendant, but in a perpendicular

9

direction away from the truck when the fatal shot was fired.  Moreover, the bullet entered Campos–Perez's upper left arm, severed the humerus, exited the arm through the armpit, and then entered the chest cavity, penetrated the heart, both lungs and liver, passed through a rib, and lodged in the soft tissue on the right side of his body.  This path is inconsistent with [McConnell's] claim that Campos–Perez ran toward him and that [McConnell] fired at the center of his chest.

*McConnell*, 2012 WL 267899, at *3.

Accordingly, it cannot be said that the state courts' rejection of this ineffective assistance claim is contrary to, or an unreasonable application of, federal law, and McConnell is not entitled to relief on this ground.

    2.    *Failure to advise, prepare, and call McConnell to testify*

McConnell additionally faults counsel for failing to advise, prepare, and call him to testify.  A tactical decision exercised by counsel deserves deference when counsel makes an informed decision based on strategic trial considerations and the decision appears reasonable under the circumstances.  *See Sanders v. Ratelle*, 21 F.3d 1446, 1456 (9th Cir. 1994).  On the other hand, "it cannot be permissible trial strategy, regardless of the merits or otherwise, for counsel to override the ultimate decision of a defendant to testify contrary to his advice," *United States v. Mullins*, 315 F.3d 449, 453 (5th Cir. 2002), because "a defendant in a criminal case has the right to take the witness stand and testify in his or her own defense," *Rock v. Arkansas*, 483 U.S. 44, 49 (1987).  A defendant may, however, waive this right, either explicitly or implicitly. *See United States v. Pino-Noriega*, 189 F.3d 1089, 1094 (9th Cir. 1999).  Such a waiver may be inferred from a defendant's failure to testify at trial or to notify the trial court of his desire to testify.  *See id.* at 1094-1095.  "Although the ultimate decision whether to testify rests with the defendant, he is presumed to assent to his attorney's tactical decision not to testify," unless he

"reject[s] his attorney's tactical decision by insisting on testifying, speaking to the court, or discharging his lawyer." *United States v. Joelson*, 7 F.3d 174, 177 (9th Cir. 1993).

Here, McConnell has failed to demonstrate that counsel rendered prejudicially ineffective assistance by advising him to waive his right to testify on his own behalf. The record does not indicate that McConnell ever expressed to the trial court that he intended or desired to testify over counsel's objections or advice. Indeed, McConnell acknowledges that he waived his right to testify in writing. While McConnell may now wish, with the benefit of hindsight, that he had testified at trial, the record reflects that McConnell voluntarily waived that right. Although he now suggests that his legal ignorance led to his waiver of his right to testify, he provides no evidence to support any claim that the waiver was the product of coercion or other unlawful inducement. McConnell is therefore not entitled to relief on this ineffective assistance claim either.

B.      *Actual Innocence* (Ground 3)

McConnell also claims that his conviction should be reversed because he is actually innocent of the crime. As Respondent correctly notes, while a federal habeas petitioner may assert a claim of actual innocence to overcome a procedural bar to review, *Schlup*, 513 U.S. at 326, the Supreme Court has never held that a freestanding claim of innocence is cognizable in a § 2254 petition filed by a non-capital defendant, *see House v. Bell*, 547 U.S. 518, 554-55 (2006); *Dist. Atty's Office for Third Judicial Dist. v. Osborne*, 557 U.S. 52, 71-72 (2009). The Supreme Court has instead declined to answer the question, noting that where "[p]etitioner has failed to make a persuasive showing of actual innocence[,] . . . the Court has no reason to pass on, and appropriately reserves, the question whether federal courts may entertain convincing claims of

actual innocence." *Herrera v. Collins*, 506 U.S. 390, 427 (1993) (O'Connor, J., concurring).

The Ninth Circuit, however, has assumed as much without deciding the question and has held

that "a habeas petitioner asserting a freestanding innocence claim must go beyond demonstrating

doubt about his guilt, and must affirmatively prove that he is probably innocent." *Carringer v.

Stewart*, 132 F.3d 463, 476 (9th Cir. 1997) (en banc) (adopting the view of Justice Blackmun in

his dissent in *Herrara*, 506 U.S. at 442-44 (Blackmun, J., dissenting)).  Following the lead of the

circuit, assuming, but not deciding, that a freestanding actual innocence claim is cognizable in a

§ 2254 proceeding, it is necessary to apply the appropriate standard to the evidence.  *See Jones v.

Taylor*, 763 F.3d 1242, 1246 (9th Cir. 2014) (noting that it "assumed that [a freestanding actual

innocence claim] is viable").

     Although the Ninth Circuit has not "articulated the precise" standard to establish a

"freestanding actual innocence claim," *id.* at 1247, it has called the standard "extraordinarily

high," *id.* at 1246 (citations and internal quotation marks omitted).  "[A]t a minimum, the

petitioner must go beyond demonstrating doubt about his guilt, and must affirmatively prove that

he is probably innocent."  *Id.* (citations and internal quotation marks omitted).  Indeed, both the

Supreme Court and the Ninth Circuit have rejected freestanding actual innocence claims in the

face of compelling new evidence where the new evidence did not "'conclusive[ly] exonerat[e]'"

the petitioner or "'preclude any possibility of [the petitioner's] guilt.'"  *Id.* at 1247-48 (quoting

*House v. Bell*, 547 U.S. 518, 555 (2006) and *Carriger v. Stewart*, 132 F.3d 463, 477 (9th Cir.

1997)).

     Measured against this standard, McConnell has fallen far short of establishing his actual

innocence.  McConnell does not dispute that he killed Campos; he instead argues that the killing

was legally justified.  But McConnell has not presented any "new" evidence of the type or quantity that would call his conviction into question.  Absent any additional evidence of the nature or quality required by *Schlup*, McConnell has failed to make a credible showing of actual innocence and cannot demonstrate that it is more likely than not that no reasonable juror would have convicted him.  *Schlup*, 513 U.S. at 324.

Although McConnell refers to "actual innocence," his Petition appears to argue that the evidence against him was legally insufficient to sustain the murder conviction.  The Court will therefore liberally construe McConnell's *pro se* Petition to assert an insufficiency of the evidence claim as well.  *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam).

As articulated by the Supreme Court in *Jackson*, the federal constitutional standard for sufficiency of the evidence is whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in the original); *see McDaniel v. Brown*, 558 U.S. 120, 132-33 (2010) (reaffirming this standard).  This Court must therefore determine whether the California court unreasonably applied *Jackson*.  In making this determination, this Court may not usurp the role of the finder of fact by considering how it would have resolved any conflicts in the evidence, made the inferences, or considered the evidence at trial.  *Jackson*, 443 U.S. at 318-19.  Rather, when "faced with a record of historical facts that supports conflicting inferences," this Court "must presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any such conflicts in favor of the prosecution, and defer to that resolution."  *Id.* at 326.

It is a fundamental precept of dual federalism that the States possess primary authority for defining and enforcing the criminal law. *See Engle v. Isaac*, 456 U.S. 107, 128 (1982). Consequently, although the sufficiency of the evidence review by this Court is grounded in the Fourteenth Amendment, it must take its inquiry by reference to the elements of the crime as set forth in state law. *Jackson*, 443 U.S. at 324 n.16. A fundamental principle of our federal system is "that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *see West v. AT&T*, 311 U.S. 223, 236 (1940) ("[T]he highest court of the state is the final arbiter of what is state law. When it has spoken, its pronouncement is to be accepted by federal courts as defining state law . . . ."). "Federal courts hold no supervisory authority over state judicial proceedings and may intervene only to correct wrongs of constitutional dimension." *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 345 (2006) (quoting *Smith v. Philips*, 455 U.S. 209, 221 (1982)) (internal quotation marks omitted).

Under *Jackson*, this Court's role is simply to determine whether there is any evidence, if accepted as credible by the trier of fact, sufficient to sustain conviction. *Schlup v. Delo*, 513 U.S. 298, 330 (1995). The United States Supreme Court has recently even further limited a federal court's scope of review under *Jackson*, holding that "a reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." *Cavazos v. Smith*, 132 S. Ct. 2, 4 (2011) (per curiam). *Jackson* "makes clear that it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial." *Id.* at 3-4. Under *Cavazos*, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because

14

the federal court disagrees with the state court.  The federal court instead may do so only if the state court decision was 'objectively unreasonable.'"  *Id.* at 4 (*quoting Renico v. Lett*, 559 U.S. 766, 773 (2010)).

In support of his claim, McConnell reiterates his version of the events, alleging that "[t]here are at least 4 separate and distinct instances where [he] had easy opportunities in which to shoot Mr. Campos and he chose not to."  McConnell contends that "[t]he jury lacked critical information," including "the confusion and fear engendered by the vicious and unprovoked attack from behind by Mr. Campos upon Mr. McConnell."  But this argument merely re-alleges the argument dismissed above that the jury should have heard his testimony.  Indeed, the jury heard McConnell's account through defense counsel's argument, and it was therefore before the jury for its assessment.  This Court is precluded from re-weighing the evidence.  *Schlup*, 513 U.S at 330.  Although it might have been possible to draw a different inference from the totality of the evidence, this Court is required to resolve that conflict in favor of the prosecution.  *See Jackson*, 443 U.S. at 326.  Here, the physical evidence as discussed above amply supports the courts' conclusion that a rational trier of fact could have found the essential elements of second-degree murder beyond a reasonable doubt, especially in light of the deference owed under *Jackson*, *Cavazos*, and the AEDPA.  McConnell is therefore not entitled to relief on this ground in any event.

C.      *Failure to Suppress Statement to Law Enforcement* (Ground 4)

McConnell next argues that the trial court erred in failing to suppress on *Miranda*[3]

grounds his statements to law enforcement after the incident.  The Court of Appeal laid out the

following facts underlying this claim:

> As already mentioned, [McConnell] was initially questioned by Detective Smith on his porch the day following the shooting.  Because several rifles were also on the porch, defendant was handcuffed in order to protect the safety of the officers. [McConnell] was given a preliminary alcohol screening (PAS) test, which recorded a blood-alcohol level of .165 percent.  [McConnell] did not appear to be intoxicated.  As Detective Smith explained: "[H]e didn't have any slurred speech and his walking ability was fine, his—I think his mental state was fine with his mind.  He was answering my questions, he wasn't slurring his words. I didn't notice him to be intoxicated." [McConnell] was advised of his *Miranda* rights, acknowledged that he understood these rights, and stated: "I'll tell you what happened."
>
> [McConnell] then explained that Campos–Perez was a "friendly" sheepherder who did not speak English very well and whose dog had impregnated [McConnell's] dog the previous year.  Campos–Perez's ATV broke down at [McConnell's] house the previous night.  [McConnell] examined the ATV and determined that he could not fix the vehicle.  Campos–Perez brought a bottle of vodka, had been "drinking pretty heavily," and was "way drunk" when he arrived.  [McConnell] also drank "a couple shots" of vodka with Campos–Perez while the two were on the porch.  Without warning, Campos–Perez hit [McConnell] several times, knocking him out of his chair and onto the floor.  When [McConnell's] dog stepped in to protect [McConnell], Campos–Perez started kicking the animal.  [McConnell] then got up and knocked Campos–Perez off of the porch.  [McConnell] tried to get the dog to come in the house, but the animal was "pretty freaked out" and would not obey his commands.
>
> [McConnell] then went inside the house to get a rifle for protection.  While [McConnell] was doing so, Campos–Perez started [McConnell's] truck.  [McConnell] ran out of the house with the rifle.  Campos–Perez "tried to run over [McConnell's] dog" and ended up crashing in the ditch.  As [McConnell] approached the truck with the rifle, Campos–Perez "got out of the truck and came at [him]."  Afraid that Campos–Perez was "going to kill [him]," [McConnell] shot him in the chest.
>
> Sergeant Peay arrived later in the afternoon and joined in the questioning.  After Detective Smith pointed out that there was a bullet hole in the side of the truck, [McConnell] stated he did not remember firing more than one shot, but explained that "[i]t was pretty nuts" and he "may have shot a warning shot."  [McConnell] also explained that he thought the rifle "dry fired" once and that he was "scared" because

---

[3]      *Miranda v. Arizona*, 384 U.S. 436 (1966).

Campos–Perez "went psycho on [him]." When Sergeant Peay asked whether [McConnell] had a handgun with him the previous night, [McConnell] responded: "Nope."

With respect to the fight itself, [McConnell] added that he helped Campos–Perez to his feet after knocking him off the porch because he "felt bad" for knocking him down. [McConnell] abandoned the claim that Campos–Perez tried to run his dog over, stating instead that when he got out of the house with the rifle, the truck was already in the ditch. [McConnell] repeated that when he reached the truck, about six to eight feet behind the driver's side of the vehicle, Campos–Perez "came at [him]" and [McConnell] fired. According to [McConnell], the rifle "dry fired" when Campos–Perez was still in the truck. He explained that he was not trying to shoot Campos–Perez or the truck at that point, but then stated that he "must have" fired at the truck and that he was "scared." When Sergeant Peay asked [McConnell] what he was thinking when he got the rifle from the house, [McConnell] responded: "I was going to save my life." And when Sergeant Peay pointed out that Campos–Perez was leaving in [McConnell's] truck when [McConnell] grabbed the rifle, [McConnell] answered that he "thought he was coming back" and that "crazy people will come back."

At the close of the interview, Detective Smith stated: "We're trying to figure out what, what we're going to do with you. [¶] . . . [¶] . . . I'll tell you what, if anything if you think of anything later on if you happen to go with the deputies if you got something else to talk about, don't be afraid to call [¶] . . . [¶] Because I think once you get your attorney you're not going to be able to probably talk to us anymore . . . [¶] . . . [¶] He'll shut you down."

As already mentioned, [McConnell] was arrested later in the evening and transported to the Plumas County Jail. [McConnell] was exhibiting symptoms of alcohol withdrawal when he arrived and was given the anti-anxiety medication Librium to ease these symptoms. Shortly after midnight, [McConnell] was transported to the Sheriff's Department and again questioned by Detective Smith and Sergeant Peay. While [McConnell] appeared to be tired, he did not appear to be sick or disoriented. Detective Smith again advised [McConnell] of his *Miranda* rights and [McConnell] again acknowledged that he understood these rights before answering questions.

[McConnell] began by admitting he had a .45 caliber handgun that he "might have grabbed" the night he killed Campos–Perez, but stated that he did not remember shooting this gun and that he gave it back to Meyer and did not want to get his friend involved. [McConnell] then recounted the version of events previously delivered, with the addition of the role played by the .45 caliber handgun. After [McConnell] and Campos–Perez drank "eight or nine shots" of vodka, Campos–Perez hit [McConnell] several times without warning, knocking him to the floor and prompting [McConnell's] dog to become involved. Campos–Perez started yelling in Spanish and kicked the dog. [McConnell] grabbed Campos–Perez, threw him off of the porch, and then helped him up. Campos–Perez continued kicking the dog. [McConnell] ran into the house and retrieved the .45 caliber handgun. While [McConnell] was in the house, Campos–Perez tried to steal his truck. [McConnell] ran outside with the handgun and "must have" fired two rounds at the vehicle. [McConnell] then ran back into the house and exchanged the

17

handgun for the rifle.  As [McConnell] approached the truck with the rifle, Campos–Perez emerged from the driver's side of the vehicle and "came at [him]." [McConnell] pulled the trigger, but the rifle did not fire.  [McConnell] chambered another round, and shot Campos–Perez in the chest.

Toward the end of the interview, [McConnell] stated: "Well actually it's probably about time to get an attorney involved in this."  [McConnell] then paused and said: "No, I don't really.  I'm not trying to mislead you guys I have a hard time even figuring out what my own intentions were [¶] . . . [¶] I know me I'm not a murderous thug or anything [¶]   . . . [¶] However, I do believe in protecting life and property."  [McConnell] then stated: "I think I better wait for an attorney at this point."  [McConnell] answered some "fairly innocuous" questions following this statement.

[McConnell] moved to suppress the statements made during these interviews. The trial court denied the motion with respect to the first interview and the majority of the second interview, suppressing only those statements elicited after [McConnell] stated that he wanted to wait for an attorney.

*McConnell*, 2012 WL 267899, at *6-7.

In *Miranda*, the United States Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination."  384 U.S. at 444.  Under this rubric, an interrogating officer must first advise the potential defendant that he or she has the right to consult with a lawyer, the right to remain silent and that anything stated can be used in evidence against him or her prior to engaging in a custodial interrogation.  *Id.* at 473-74.  Once *Miranda* warnings have been given, if a suspect makes a clear and unambiguous statement invoking his constitutional rights, "all questioning must cease."  *Smith v. Illinois*, 469 U.S. 91, 98 (1984).

A defendant may waive his *Miranda* rights so long as the waiver is "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception," and "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."  *Moran v. Burbine*, 475 U.S. 412, 421 (1986).

A valid waiver of *Miranda* rights depends upon the totality of the circumstances.  "The waiver inquiry 'has two distinct dimensions': waiver must be 'voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception,' and 'made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.'"  *Berghuis v. Thompkins*, 560 U.S. 370, 382-83 (2010) (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)).  Although some earlier Supreme Court cases had indicated the government had a "heavy burden" to show waiver, *Berghuis* explained that the burden is not too onerous.  *Berghuis*, 560 U.S. at 384.  Indeed, the waiver may be implied by conduct, and need not be explicit or written.  *Id.* at 383.

> If the State establishes that a *Miranda* warning was given and the accused made an uncoerced statement, this showing, standing alone, is insufficient to demonstrate "a valid waiver" of *Miranda* rights.  The prosecution must make the additional showing that the accused understood these rights.  Where the prosecution shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent. . . .  As a general proposition, the law can presume that an individual who, with a full understanding of his or her rights, acts in a manner inconsistent with their exercise has made a deliberate choice to relinquish the protection those rights afford.

*Berghuis*, 560 U.S. at 384-85 (citations omitted).

In this case, McConnell contended that, although he voluntarily waived his *Miranda* rights, he was drunk, tired and had chronic liver disease.  But, consistent with California state law as explained by the Court of Appeal, under federal law, "[i]ntoxication does not preclude voluntariness unless it reaches the level of incapacitation that overcomes the defendant's free will."  *United States v. Evanston*, 441 F. App'x 492, 492 (9th Cir. 2011) (citing *Medeiros v. Shimoda*, 889 F.2d 819, 823 (9th Cir. 1989)).  The state appellate court properly considered the

totality of the circumstances in determining that McConnell validly waived his *Miranda* rights

because he was coherent and able to comprehend the situation.  The court reasoned:

> In this case, despite [McConnell's] blood-alcohol level and liver disease, he was
> coherent, did not slur his words, stated that he understood each right that was read to him,
> appeared to understand the questions posed, and gave detailed answers.  Indeed,
> Detective Smith believed "the [preliminary alcohol screening test] might have been a
> mistake" until [McConnell]  acknowledged that he had taken a large shot of vodka from a
> coffee cup.  We conclude that [McConnell] was aware of and understood his Miranda
> rights and voluntarily, knowingly, and intelligently waived these rights.
> . . . .
> After reviewing the record, including the taped statements, we do not find the
> requisite coercion.  Moreover, the mere fact that [McConnell] had a blood-alcohol level
> of .165 percent during the interview on his porch does not render the statements adduced
> during that interview involuntary.  Nor does the fact that [McConnell] was suffering from
> alcohol withdrawal and given Librium shortly before the second interview at the Sheriff's
> Department.  We conclude [McConnell's] capacity to comprehend and resist was not "so
> disabled that he was incapable of free or rational choice."

*McConnell*, 2012 WL 267899, at *9-10 (citations and parentheticals omitted).

In light of *Berghuis*, 560 U.S. at 383, this Court does not find that the state court's

determination that McConnell's statements were voluntary within the meaning of the Due

Process Clause contravenes or unreasonably applies federal law.  McConnell is therefore not

entitled to habeas relief on this claim.

D.     *Instructional Error* (Ground 6)

McConnell additionally claims that he was denied due process when the trial court

refused to give a requested jury instruction informing the jury that an assault, trespass, or theft of

property could amount to "provocation" sufficient to reduce murder to involuntary manslaughter.

A challenged instruction violates the federal constitution if there is a "reasonable likelihood that

the jury has applied the challenged instruction in a way that prevents the consideration of

constitutionally relevant evidence."  *Boyde v. California*, 494 U.S. 370, 380 (1990).  The

20

question is whether the instruction, when read in the context of the jury charges as a whole, is

sufficiently erroneous to violate the Fourteenth Amendment. *Francis v. Franklin*, 471 U.S. 307,

309 (1985). This Court must also assume in the absence of evidence to the contrary that the jury

followed those instructions. *Weeks v. Angelone*, 528 U.S. 225, 234 (2000); *Richardson v.

Marsh*, 481 U.S. 200, 206 (1987) (noting the "almost invariable assumption of the law that jurors

follow their instructions"); *see Francis*, 471 U.S. at 323-24 & n.9 (discussing the subject in

depth).

It is well-established that not only must the challenged instruction be erroneous but it

must violate some constitutional right, and it may not be judged in artificial isolation but must be

considered in the context of the instructions as a whole and the trial record. *Estelle*, 502 U.S. at

72. This Court must also bear in mind that the Supreme Court has admonished that the inquiry is

whether there is a reasonable likelihood that the jury applied the challenged instruction in a way

that violates the constitution and that the category of infractions that violate "fundamental

fairness" is very narrowly drawn. *Id.* at 72-73. "Beyond the specific guarantees enumerated in

the Bill of Rights, the Due Process clause has limited operation." *Id.* at 73 (citation omitted).

Where the defect is the failure to give an instruction, the burden is even heavier because an

omitted or incomplete instruction is less likely to be prejudicial than an instruction that misstates

the law. *See Henderson v. Kibbe*, 431 U.S. 145, 155 (1977). In those cases, the inquiry is

whether the trial court's refusal to give the requested instruction "so infected the entire trial that

the resulting conviction violates due process." *Id.* at 156-57; *Estelle*, 502 U.S. at 72.

The Court of Appeal considered and rejected McConnell's instructional error claim on

direct appeal as follows:

[McConnell] further asserts that his constitutional rights were violated when the trial court declined to give certain requested jury instructions, one of which would have informed the jury that an assault, trespass, or theft of property could amount to "provocation" sufficient to reduce murder to voluntary manslaughter.  He is mistaken.

"Murder involves the unlawful killing of a human being with malice aforethought [§ 187, subd. (a) ], but a defendant who intentionally commits an unlawful killing without malice is guilty only of voluntary manslaughter [§ 192]. [Citation.]  For purposes of voluntary manslaughter, an intentional unlawful killing can lack malice when the defendant acted under a ""'sudden quarrel or heat of passion' "'or when the defendant acted under '"[an] unreasonable but good faith belief in having to act in self-defense."' [Citation.]"  (*People v. Blacksher* (2011) 52 Cal.4th 769, 832.)  "Because heat of passion and unreasonable self-defense reduce an intentional, unlawful killing from murder to voluntary manslaughter by negating the element of malice that otherwise inheres in such a homicide [citation], voluntary manslaughter of these two forms is considered a lesser necessarily included offense of intentional murder [citation]."  (*People v. Breverman* (1998) 19 Cal.4th 142, 153–154.)

"'It is well settled that the trial court is obligated to instruct on necessarily included offenses—even without a request—when the evidence raises a question as to whether all of the elements of the charged offense are present and there is evidence that would justify a conviction of such a lesser offense.' [Citation.]"  (*People v. Ledesma* (2006) 39 Cal.4th 641, 715.)

In accordance with this rule, the trial court properly instructed the jury regarding voluntary manslaughter.  After the jury was instructed on the elements of murder and the difference between first and second degree murder, the jury was informed: "Provocation may reduce a murder from first degree to second degree and may reduce a murder to manslaughter.  The weight and significance of the provocation, if any, are for you to decide.  [¶]  If you conclude the defendant committed murder but was provoked, consider the provocation in deciding whether the crime was first or second degree murder.  Also, consider the provocation in deciding whether the defendant committed murder or manslaughter." (CALCRIM No. 522.)

The jury was then instructed on heat of passion voluntary manslaughter: "A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion. [¶] A defendant killed someone because of a sudden quarrel or in the heat of passion if: [¶] One: The defendant was provoked; [¶] Two: As a result of the provocation the defendant acted rashly and under the influence of intense emotion that obscured his reasoning or judgment; and [¶] Three: The provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment. [¶] Heat of passion does not require anger, rage, or any specific emotion. It can be any violent or intense emotion that causes a person to act without due deliberation and reflection." (CALCRIM No. 570.)

The instruction continued: "In order for heat of passion to reduce a murder to voluntary manslaughter, the defendant must have acted under the direct and immediate influence of provocation as I have defined it.  While no specific type of provocation is

22

required, slight or remote provocation is not sufficient.  Sufficient provocation may occur over a short or long period of time.  [¶]  It is not enough that the defendant simply was provoked.  The defendant is not allowed to set up his own standard of conduct.  You must decide whether the defendant was provoked and whether the provocation was sufficient. In deciding whether the provocation was sufficient, consider whether a person of average disposition would have been provoked and how such a person would react in the same situation, knowing the same facts.  [¶]  If enough time passed between the provocation and the killing for a person of average disposition to cool off and re[g]ain his or her clear reasoning and judgment, then the killing is not reduced to voluntary manslaughter on this basis.  [¶]  The People have a burden of proving beyond a reasonable doubt that the defendant did not kill as a result of a sudden quarrel or in the heat of passion.  If the People have not met this burden, you must find the defendant [not] guilty of murder."[FN4] (CALCRIM No. 570.)

> FN4.    The version of the instruction given to the jurors during their deliberations properly instructs: "If the People have not met this burden, you must find the defendant not guilty of murder."  However, the reporter's transcript records the last half of this sentence as "you must find the defendant guilty of murder."  This was either a misstatement by the trial court or a typographical error by the court reporter.  Assuming it was the former, in light of the instructions as a whole, we do not believe the jury would have been misled by the error.  Nor does defendant raise this error on appeal and has therefore forfeited the issue.  (*See Critzer v. Enos* (2010) 187 Cal.App.4th 1242, 1261–1262 [failure to raise an issue on appeal may result in a forfeiture of the issue].)

The jury was also properly instructed on imperfect self-defense voluntary manslaughter (CALCRIM No. 571), self-defense as a complete defense to murder and voluntary manslaughter (CALCRIM No. 505), and on the right to use reasonable force to eject a trespasser from real property (CALCRIM No. 3475).

[McConnell] complains that the trial court refused to give the jury the following instruction: "Where it is shown that the defendant was provoked by an assault, trespass, or theft of property, such provocation may be sufficient to reduce murder to manslaughter."  [McConnell] argues that this instruction was needed to clarify CALCRIM No. 570 because "almost any emotion can fall within the category of legal provocation; it can be 'any violent, intense, high-wrought or enthusiastic emotion.'" According to [McConnell], "without a pinpoint instruction that informs the jury which emotions potentially amount to legal provocation, the jury is left at sea, and is likely to base its decision on subjective factors rather than any rule of law."  We are not persuaded.

[McConnell] is correct, of course, that "[a] criminal defendant is entitled, on request, to an instruction 'pinpointing' the theory of his defense."  (*People v. Wharton* (1991) 53 Cal.3d 522, 570 (*Wharton* ); *People v. Wright* (1988) 45 Cal.3d 1126, 1137.) However, "instructions that attempt to relate particular facts to a legal issue are generally

objectionable as argumentative [citation], and the effect of certain facts on identified theories 'is best left to argument by counsel, cross-examination of the witnesses, and expert testimony where appropriate.'" (*Wharton*, *supra*, 53 Cal.3d at p. 570, quoting *People v. Wright*, *supra*, 45 Cal.3d at p. 1143.)

In *Wharton*, *supra*, 53 Cal.3d 522, our Supreme Court held that the trial court "erred in refusing to instruct the jury, at defendant's request, that legally adequate provocation could occur over a considerable period of time." (*Id.* at p. 571.)  There, the defendant's theory at trial was that "no single action on the part of the victim provoked the fatal blow" and that a certain "book-throwing incident was merely the culmination of his pent-up frustration and anger emanating from his ongoing dysfunctional relationship with the victim.  In other words, his defense theory at trial was that he killed after enduring provocatory conduct by the victim over a period of weeks." (*Ibid*.)  Our Supreme Court concluded: "Because defendant requested a 'pinpoint' instruction on his theory of the case that was neither argumentative nor duplicated in the standard instructions, the trial court erred in failing to deliver it to the jury." (*Ibid.*)

The same was not true, however, with respect to the trial court's refusal of another requested instruction which would have told the jury that "if provocation occurred over such a period, the jury 'must' take that period of time into account in determining the effect of the cooling-off period." (*Wharton*, *supra*, 53 Cal.3d at p. 570.) Our Supreme Court explained: "By directing that the jury 'must' take into account the long period of provocation in determining the effect of a cooling-off period, defendant's proposed instruction improperly singled out one factor, favorable to defendant, and improperly elevated it over other factors that the jury should also consider.  This portion of the instruction was thus objectionable as argumentative and properly refused . . . ." (*Id*. at p. 571.)

Here, [McConnell's] theory was that Campos–Perez trespassed on his property, assaulted him on the porch, and attempted to steal his truck, all of which provoked [McConnell] to act from passion rather than from judgment.  Unlike *Wharton*, where the jury would not have understood that legally adequate provocation could occur over a considerable period of time, we do not believe the jury in this case needed to be told that an assault, trespass, or theft of property could amount to provocation.  This is so because the jury was told that "no specific type of provocation is required." (CALCRIM No. 570.)  The jury was also told that any act or series of acts "over a short or long period of time," can amount to legally adequate provocation if it "would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment." (*Ibid*.)  We believe the jury understood from the instructions given that assault, trespass, and theft of property could amount to provocation.

Defendant also complains that the trial court refused to instruct the jury with CALJIC No. 8.44, which provides: "Neither fear, revenge, nor the emotion induced by and accompanying or following an intent to commit a felony, nor any or all of these emotional states, in and of themselves, constitute the heat of passion referred to in the law of manslaughter.  Any or all of these emotions may be involved in a heat of passion that causes judgment to give way to impulse and rashness.  Also, any one or more of them may exist in the mind of a person who acts deliberately and from choice, whether

the choice is reasonable or unreasonable." The trial court refused this instruction as "more confusing than helpful to the jury" and explained that the same concept was "covered in the CALCRIM jury instructions." We agree with the trial court's assessment.

The point conveyed by CALJIC No. 8.44 is that no specific emotion alone constitutes heat of passion. (*See People v. Booker* (2011) 51 Cal.4th 141, 181, fn. 21.) The same point is adequately made by CALCRIM No. 570: "Heat of passion does not require anger, rage, or any specific emotion. It can be any violent or intense emotion that causes a person to act without due deliberation and reflection." While CALCRIM No. 570 uses different examples of emotions that may cause a person to act without due deliberation and reflection, *i.e.*, in the heat of passion, the same point is made.

Finally, [McConnell] complains that the trial court refused to give the jury the following instruction: "If you find the alleged victim herein came onto the defendant's property and assaulted him and otherwise committed illegal acts such as stealing the defendant's vehicle and driving in a dangerous manner, and those actions caused immediate fear and panic, under these circumstances you may reasonably infer that the defendant was aroused to passion and his reason was obscured by such provocation which may be sufficient to produce such effects in a person of average disposition and based on those facts if you believe them to be true, the defendant would be guilty of manslaughter only, if anything." This proposed instruction is argumentative and was properly refused by the trial court. (*See People v. Wright*, *supra*, 45 Cal.3d at p. 1137 [argumentative instruction "implies certain conclusions from specified evidence"].)

Having found no instructional error, we also reject [McConnell's] assertion that his due process right to present a complete defense was violated.

*McConnell*, 2012 WL 267899, at *10-14.

The Court finds no basis for disagreeing with the California Court of Appeal's determination that the trial court did not err with respect to any of the challenged or omitted instructions. As the appellate court reasonably concluded, McConnell cannot establish that the instructions as given rendered his trial fundamentally unfair in light of the instructions as a whole.

Moreover, McConnell cites no federal law compelling the provision of instructions in the manner he requested and indeed cites only state law in support of his claim. However, "the fact that [an] instruction was allegedly incorrect under state law is not a basis for habeas relief." *Estelle*, 502 U.S. at 71-72 (citing *Marshall v. Lonberger*, 459 U.S. 422, 438 n.6 (1983) ("[T]he

Due Process Clause does not permit the federal courts to engage in a finely tuned review of the state evidentiary rules.")); *Horton v. Mayle*, 408 F.3d 570, 576 (9th Cir. 2005) ("If a state law issue must be decided in order to decide a federal habeas claim, the state's construction of its own law is binding on the federal court.").  Claims of error in state jury instructions are generally a matter of state law that do not usually invoke a constitutional question.  *Gilmore v. Taylor*, 508 U.S. 333, 342-43 (1993).  This Court is bound by the state appellate court's determination that the trial court did not err with respect to the instructions, in the absence of any due process violation.  McConnell fails to establish a due process violation here because he may not transform his state instructional error claim into a federal claim by simply asserting a violation of his constitutional rights.  *Langford v. Day*, 110 F.3d 1380, 1389 (9th Cir. 1996) (a petitioner cannot transform a state-law issue into a federal one by simply asserting a due process violation); *see also Dunckhurst v. Deeds*, 859 F.2d 110, 114 (9th Cir. 1988) (an instructional error "does not alone raise a ground cognizable in a federal habeas corpus proceeding") (citation omitted).  Accordingly, McConnell's instructional error claim must fail.

E.      *Prosecutorial Misconduct* (Ground 7)

        Finally, McConnell contends that the prosecutor committed misconduct when he quoted from a California Supreme Court case during summation.  To successfully raise a claim cognizable on habeas review based on a prosecutor's comments at trial, a petitioner must demonstrate that the prosecutor's comments "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).  Under this standard, only egregious prosecutorial misconduct can give rise to a constitutional claim.  *See Duckett v.*

26

*Godinez*, 67 F.3d 734, 743 (9th Cir. 1995).  A prosecutor's comments in summation constitute

grounds for reversal only when the remarks caused actual prejudice.  *Shaw v. Terhune*, 380 F.3d

473, 478 (9th Cir. 2004) (applying harmless error test to claim of prosecutorial misconduct in

summation).  Moreover, a prosecutor must have "reasonable latitude" to fashion closing

arguments.  *United States v. Molina*, 934 F.2d 1440, 1445 (9th Cir. 1991).

On direct appeal, the Court of Appeal described the challenged conduct underlying

McConnell's prosecutorial misconduct claim and ultimately dismissed the claim as follows:

> We also reject [McConnell's] contention that his conviction must be reversed
> because the prosecutor quoted the following passage from *In re Christian S.* (1994) 7
> Cal.4th 768 at page 783, during his closing argument to the jury: "We caution, however,
> that the doctrine [of imperfect self-defense] is narrow.  It requires without exception that
> the defendant must have had an actual belief in the need for self-defense.  We also
> emphasize what should be obvious.  Fear of future harm—no matter how great the fear
> and no matter how great the likelihood of the harm—will not suffice.  The defendant's
> fear must be of imminent danger to life or great bodily injury.  '"[T]he peril must appear
> to the defendant as immediate and present and not prospective or even in the near future.
> An imminent peril is one that, from appearances, must be instantly dealt with." . . . [¶]
> This definition of imminence reflects the great value our society places on human life.'
> [Citation.]"
>
> [McConnell] argues that "[r]eading the Supreme Court language on 'imminent
> peril' distorted the legal rule and denied [McConnell] a fair trial."  He relies on *People v.
> Hawthorne* (1992) 4 Cal.4th 43 (*Hawthorne*), a case in which the prosecutor, in closing
> argument, "impugned the integrity of [defense] counsel, in part by quoting from Justice
> White's dissenting opinion in *United States v. Wade* (1967) 388 U.S. 218 [18 L.Ed.2d
> 1149], to the effect that law enforcement has an obligation to ascertain 'the true facts
> surrounding the commission of the crime' [citation], which defense counsel do not."
> (*Hawthorne*, *supra*, 4 Cal.4th at p. 59.)  Our Supreme Court held this to be misconduct:
> "The closing statements of counsel should relate to the law and the facts of the case as
> each side interprets them. Whether or not attributed, the views expressed in Justice
> White's dissent interject an extraneous generalization, potentially diverting the jury's
> attention from the specifics upon which they must focus.  Moreover, this generalization
> 'is not one that is shared by all judges or courts.  It paints with too broad a brush.'
> [Citation.]  We therefore disapprove its use even in response to a personal attack by
> defense counsel." (*Id.* at pp. 60–61.)
>
> However, this misconduct did not require reversal: "The prosecutor did not
> express any improper personal opinions regarding defendant's guilt or the credibility of
> witnesses.  [Citation.]  This portion of the argument was relatively brief and, especially

when viewed in context, hardly so inflammatory as to distract the jury from a thorough and reasoned evaluation of the evidence.  [Citation.]  Finally, the court specifically admonished the jury 'not to consider any citations or any judge's statements in any case . . . .  It is not to be part of your consideration . . . .'  We find no likelihood that the jury failed to place the arguments of counsel in proper perspective or that the objectionable comments materially contributed to the verdict."  (*Hawthorne*, *supra*, 4 Cal.4th at p. 61.)

We need not decide whether the prosecutor in this case engaged in misconduct by reading from *In re Christian S.*, *supra*, 7 Cal.4th 768, because we find no conceivable prejudice.  Unlike the portion of Justice White's dissent read by the prosecutor in *Hawthorne*, the quote read in this case is an accurate statement of the law that came from a majority opinion of our Supreme Court.  We fail to see how [McConnell] could have been prejudiced by an accurate statement of the law.  Moreover, like *Hawthorne*, the quotation was relatively brief, was unlikely to distract the jury from a thorough and reasoned evaluation of the evidence, and the trial court admonished the jury that "this is not jury instruction, this is argument, and again please keep in mind that the jury instructions you're required to follow are the ones given to you by the Court."  We find "no possibility that the jury would have reached a more favorable verdict had the [purported] misconduct not occurred."  (*People v. Wash* (1993) 6 Cal.4th 215, 261; *People v. Gionis* (1995) 9 Cal.4th 1196, 1220.)

*McConnell*, 2012 WL 267899, at *14-15.

McConnell fares no better on federal habeas review.  The Court of Appeal's conclusion that the prosecutor's comments did not render McConnell's trial unfair is both reasonable and fully supported by the record.  Thus, for the same reasons persuasively articulated by the Court of Appeal, McConnell fails to show that the prosecutor committed prejudicial misconduct.  He is therefore not entitled to relief on any argument advanced in support of his prosecutorial misconduct claim.

F.    *Evidentiary Hearing*

McConnell further requests in his Traverse an evidentiary hearing on all of his claims.  A district court may not hold an evidentiary hearing on a claim for which a petitioner failed to develop a factual basis in state court unless the petitioner shows that: (1) the claim relies either on (a) a new rule of constitutional law that the Supreme Court has made retroactive to cases on

28

collateral review, or (b) a factual predicate that could not have been previously discovered

through the exercise of due diligence, and (2) the facts underlying the claim would be sufficient

to establish by clear and convincing evidence that, but for constitutional error, no reasonable fact

finder would have found the petitioner guilty of the underlying offense.  28 U.S.C. § 2254(e)(2).

Where the failure to develop the factual basis for the claim in the state court proceedings

is not attributable to the petitioner, to receive an evidentiary hearing, the petitioner must make a

colorable claim for relief and meet one of the factors set forth in *Townsend v. Sain*, 372 U.S. 293

(1963).  *Insyxiengmay v. Morgan*, 403 F.3d 657, 670-71 (9th Cir. 2005).  In *Townsend*, the

Supreme Court concluded that a federal habeas petitioner is entitled to an evidentiary hearing on

his factual allegations if: (1) the merits of the factual dispute were not resolved in the state

hearing; (2) the state factual determination is not fairly supported by the record as a whole;

(3) the fact-finding procedure employed by the state court was not adequate to afford a full and

fair hearing; (4) there is a substantial allegation of newly discovered evidence; (5) the material

facts were not adequately developed at the state-court hearing; or (6) for any reason it appears

that the state trier of fact did not afford the habeas applicant a full and fair fact hearing.  *Id.* at

670 (quoting *Townsend*, 372 U.S. at 313), *overruled in part by Keeney v. Tamayo-Reyes*, 504

U.S. 1 (1992).

As discussed above, McConnell has failed to assert a colorable claim for relief.  *See*

*Bashor v. Risley*, 730 F.2d 1228, 1233 (9th Cir. 1984) (holding an evidentiary hearing is not

required on issues which can be resolved on the basis of the state court record).  Because he does

not cite to new laws or underlying facts that were not developed on the record before the state

courts with respect to this claim, he has also failed to satisfy his burden of proof under 28 U.S.C. § 2254(e)(2).  McConnell's request for an evidentiary hearing must therefore also be denied.

## V. CONCLUSION AND ORDER

McConnell is not entitled to relief on any ground raised in his Petition and is not entitled to an evidentiary hearing.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the request for an evidentiary hearing is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of Appealability.  *See* 28 U.S.C. § 2253(c); *Banks v. Dretke*, 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability, a prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El*, 537 U.S. at 327)).  Any further request for a Certificate of Appealability must be addressed to the Ninth Circuit Court of Appeals.  *See* FED. R. APP. P. 22(b); 9TH CIR. R. 22-1.

The Clerk of the Court is to enter judgment accordingly.

Dated: December 5, 2016.

___/s/James K. Singleton, Jr.___
JAMES K. SINGLETON, JR.
Senior United States District Judge
